UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

JEFFERY PORETSKY AND JANET PORETSKY

        Plaintiffs

V.                                    **No. 2:15-cv-04012-JFB-AYS**

HIRISE ENGINEERING, P.C., MATTHEW
PAPPALARDO, UNITED TECHNICAL           **FIRST AMENDED COMPLAINT**
CONSULTANTS, L.L.C., GLENN GROGAN,
SIMSOL INSURANCE SERVICES, INC.,
HEZEKIAH ALLISON, NATIONAL FLOOD
SERVICES and THE STANDARD
FIRE INSURANCE COMPANY,

        Defendants.
----------------------------------------------------------X

       Plaintiffs Jeffery Poretsky and Janet Poretsky ("Plaintiffs" or "the Poretskys"), by

their attorneys, bring this complaint against Defendants HiRise Engineering, P.C. ("HiRise"),

Matthew Pappalardo ("Pappalardo"), United Technical Consultants, L.L.C. ("UTC"), Glenn

Grogan ("Grogan"), SIMSOL Insurance Services, Inc. ("SIMSOL"), Hezekiah Allison

("Allison"), National Flood Services ("NFS"), and The Standard Fire Insurance Company

("Standard Fire") (collectively "Defendants") for violations of RICO, 18 U.S.C. §1962(c) and

breach of contract. Plaintiffs allege the following upon information and belief, except as to

those paragraphs pertaining to Plaintiffs' own actions, which are alleged upon personal

knowledge.  Plaintiffs believe that substantial additional evidentiary support will exist for

the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF ACTION

1.      This case involves a scheme whereby HiRise altered or manipulated engineering reports relied on to process insurance payments under the National Flood Insurance Program ("NFIP"). By altering the reports as described below, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire benefitted from denial or underpayment of insurance claims.  If claims were denied or underpaid, HiRise, Pappalardo, UTC, Grogan, SIMSOL and Allison were able to incite and/or extend litigation and continue receiving assignments from Standard Fire. This allowed HiRise, UTC, NFS, SIMSOL, and others to reap the benefit of unnecessary claims handling and litigation expenses. As more fully described below, Standard Fire participated in the scheme so that it could justify denying or underpaying claims.  By denying or underpaying claims, Standard Fire avoided being audited by FEMA and potentially having to reimburse FEMA for prior payments received and also received additional unwarranted payments from FEMA for administering the WYO program.

2.      Based on information and belief, Standard Fire denied Plaintiffs' insurance claim based upon a false report issued by HiRise. Standard Fire had knowledge of the fraud at the time the fraud was committed. Alternatively, Standard Fire was "willfully blind" or engaged in "conscious avoidance" regarding the illegal and fraudulent actions of HiRise; therefore, Standard Fire is liable for the scheme and for damages suffered by Plaintiffs.

3.      Defendants NFS, SIMSOL and Allison blindly accepted the fraudulent conclusions touted by HiRise, UTC, Grogan, and Pappalardo. Allison conducted an inspection of Plaintiffs' property and observed the extensive damage to the home. Despite this knowledge, Allison refused to authorize payment of the full policy benefit which the Poretskys purchased. He did

this in conjunction with NFS and his employer SIMSOL to satisfy the desire of Standard Fire to reduce payments on covered losses. NFS, Allison, and SIMSOL knew that if they did not work in concert with Standard Fire and its engineer consultants to diminish insurance claims that SIMSOL and Allison would not receive additional or future claims assignments from Standard Fire.

4.      Plaintiffs had a valid insurance claim denied in part based on this scheme.  Plaintiffs were deprived of thousands of dollars in insurance proceeds as a result of the Defendants' unlawful scheme.  HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire used U.S. mail, and/or interstate telephone, facsimile, and/or email to transact the scheme.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, 28 U.S.C. §§1331, 1367, 2201 and 2202.  The Court has personal jurisdiction over Defendants pursuant to 18 U. S. C. §1965 (a) (b) and (d) as Defendants transacted their affairs in this district and ends of justice require Defendants be brought before this Court.

6.      This Court is a proper venue for this action pursuant to 18 U.S.C. §1965 (a), 28 U.S.C. §1391 (b) (2), and 28 U.S.C. §2201(a) and 2202. Venue is proper in this judicial district because it is where a substantial part of the events at issue took place.

## PARTIES

7.      Plaintiffs are individuals who reside in this district.  Plaintiffs owned real property located at 976 Jerome Street, Baldwin, New York.

8.      Defendant HiRise Engineering, P.C. is a professional corporation that is incorporated under the laws of the State of New York and with its principal place of business in Uniondale, New York. HiRise participated in the scheme to defraud as more fully described herein and is liable to Plaintiffs for the damage suffered by Plaintiffs.

9.      Defendant Matthew Pappalardo is an individual and a citizen of the State of New York. Defendant Pappalardo worked for Defendant HiRise and participated in the scheme to defraud as more fully described below and is liable to Plaintiffs for the damage suffered by Plaintiffs.

10.     Defendant UTC Technical Consultants, L.L.C. is a limited liability company incorporated under the laws of the State of Pennsylvania and with its principal place of business in Malvern, Pennsylvania.  Defendant UTC is an investigative engineering firm which participated in the scheme to defraud as described herein and below and is liable to Plaintiffs for the damage suffered by Plaintiffs.

11.     Defendant Glenn Grogan is an individual and a citizen of the State of Pennsylvania. Defendant Grogan worked for Defendant UTC and participated in the scheme to defraud as more fully described below and is liable to Plaintiffs for the damage suffered by Plaintiffs.

12.     Defendant SIMSOL is a corporation incorporated under the laws of the State of Pennsylvania with its principal place of business in Niceville, Florida.  Defendant SIMSOL is an adjusting firm that participated in the scheme to defraud as described herein and below and is liable to Plaintiffs for the damage suffered by Plaintiffs.

13.     Defendant Hezekiah Allison is an individual adjuster.  He resides in Lancaster, California. Allison participated in the scheme to defraud as more fully described below, and is liable to Plaintiffs for the damage suffered by Plaintiffs.

4

14.    Defendant National Flood Service is a flood insurance managing and servicing company based in Montana with its principal offices located in Chicago, Illinois. NFS managed the adjustment of thousands of Hurricane Sandy claims on behalf of Standard Fire and in conjunction with U.S. Forensic.

15.    Defendant Standard Fire was and is a private insurance company incorporated under the laws of the State of Connecticut. Standard Fire is a "Write Your Own" ("WYO") carrier participating in the National Flood Insurance Program ("NFIP") pursuant to the National Flood Insurance Act ("NFIA"), as amended 42 U.S.C. §4001, et seq. Standard Fire issued a Standard Flood Insurance Policy to Plaintiffs (the "Policy") in its own name, as a fiscal agent of the United States, administering federal funds.  Pursuant to 44 C.F.R. §62.23(d) and (i)(6), Standard Fire was and is responsible for arranging the adjustment, settlement, payment, and defense of all claims arising under the Policy. Under 44 C.F.R. §62, Appendix A, the federal government reimburses Standard Fire for fees and expenses incurred in the defense of litigated claims.

### SUMMARY

16.    As more fully described below, after Hurricane Sandy, Standard Fire and/or NFS assigned SIMSOL and Allison to adjust Plaintiffs' claim. Allison observed extensive damage to Plaintiffs' home. Standard Fire retained UTC and Grogan, who in turn retained HiRise to perform an engineering analysis of Plaintiffs' property.  HiRise, in turn, assigned an experienced and well-respected engineer, Andrew Braum, to inspect Plaintiffs' house for damage and write a report of his findings.  Andrew Braum assigned his assistant, Brett Sanicola, to assist with the inspection and drafting of the engineering analysis assigned by HiRise. On or about December 5, 2012, Brett Sanicola and/or Andrew Braum emailed Braum's original draft

report to HiRise. The original report transmitted contained Andrew Braum's "A.S.B. Enginerring, P.C." letterhead and contained conclusions that Plaintiffs' damage was caused by Sandy flood.

17.    When HiRise received the original report from Braum that determined Plaintiffs' house was extensively damaged by Hurricane Sandy, HiRise and Pappalardo "reviewed" and likely doctored the report, and/or requested that Sanicola change conclusions and observations to support a denial. December 10, 2012, Sanicola resubmitted via email an unsigned report on HiRise letterhead with an added signature block for Matthew Pappalardo. The resubmitted report was dated December 5, 2012, and contained conclusions such as "**This damage was 100% caused by the flood event**." Although the resubmitted report was more in line with what HiRise needed, nonetheless, HiRise and Pappalardo "reviewed" and altered the report.

18.    The report that Plaintiffs received was dated December 24, 2012, was allegedly signed by Braum and Pappalardo, and contained alterations to the December 10th version sent by Sanicola.[1] For example, the conclusion quoted above was removed from the report received by Plaintiffs, among other differences. The false report was used by the flood insurance carrier, Standard Fire, as an artifice to deny Plaintiffs' legitimate claim for insurance benefits.

19.    HiRise, Pappalardo, UTC, Grogan, SIMSOL, NFS, and Allison know that Standard Fire garners economic benefit from the unwarranted denial of NFIP claims and Standard Fire will in turn continue employing HiRise, Pappalardo, UTC, Grogan, SIMSOL, NFS, and Allison and pay them unwarranted consulting fees for their engineering and claims handling work. HiRise,

Pappalardo, UTC, Grogan, SIMSOL, NFS, and Allison know that the money they receive for their services comes from funds administered pursuant to the NFIP.

20.    At all relevant times, when Defendants were committing improper acts of fraud, including but not limited to altering reports and/or endorsing altered reports, Defendants were acting outside of any agreement between the NFIP and Defendants. The claims asserted herein against Defendants are largely based on actions exceeding Defendants' authority to act on the government's behalf. Pappalardo "reviewed" and likely doctored a number of reports in conjunction with Defendants HiRise, UTC, Grogan, Allison, NFS, Simsol, and Standard Fire, and on behalf Standard Fire. Standard Fire is a WYO Carrier administering the federal flood insurance program.

21.    As fully described below, Standard Fire participated in the scheme to wrongfully and illegally deny Plaintiffs' claim. Based on FEMA's methods for reimbursing WYO carriers for the costs associated with administering the WYO program, Standard Fire profits by systematically increasing claim handling expenses, including amounts paid to HiRise and SIMSOL. An unintended consequence of the WYO reimbursement protocol is that the more expenses Standard Fire can attribute to claims handling, the more money it will receive from FEMA and the NFIP for administering the program. A 2009 report of the U.S. Government Accountability Office ("GAO") found that WYO carriers received reimbursement for expenses above the amount actually incurred.  Standard Fire and its claims handling consultants, such as HiRise, Pappalardo, UTC, Grogan, SIMSOL, NFS, and Allison collectively stood to benefit from increasing expenses and passing them along to FEMA for reimbursement.

22.    Further, Standard Fire knows that it may be responsible if a claim is overpaid.  Standard Fire risks an audit by FEMA and/or other governmental entities if amounts paid out exceed an expected threshold. Therefore, Standard Fire systematically sought to underpay legitimate claims and either knowingly or with willful blindness accepted the fraudulent engineering and claims handling analysis touted by HiRise, Pappalardo, UTC, Grogan, SIMSOL, NFS, and Allison and blindly accepted by SIMSOL and Allison for their mutual benefit.

23.    Based on information and belief, as more fully outlined below, SIMSOL and Allison refused to recommend full payment of the claim, even when it was obvious that liability was clear.  HiRise and Pappalardo altered and rewrote the reports that were provided to the flood carriers so Standard Fire could deny, in whole or in part, Plaintiffs' claim.

## SUBSTANTIVE ALLEGATIONS

### *Background Facts*

24.    On October 29, 2012, Hurricane Sandy ("Sandy") hit New York and surrounding areas, causing severe damage to homes and businesses. Plaintiffs' house located at 976 Jerome Street, Baldwin, New York (the "Property") suffered a direct hit from Hurricane Sandy's storm surge and flood water.  Plaintiffs made a claim with their flood insurance carrier, Standard Fire. Standard Fire contracted with NFS to handle the management and adjustment of its Hurricane Sandy claims.  Standard Fire and/or NFS hired SIMSOL and adjuster Allison to inspect Plaintiffs' Property and document the claim.

25.    Allison inspected the home and observed first-hand the extensive flood damage to the Poretskys' home caused by Sandy.  However, instead of recommending that the home be

deemed a total loss and the full policy benefit paid to the Poretskys, Allison issued an estimate for approximately $55,000.[2]

26.    Standard Fire, NFS, and/or SIMSOL assigned a portion of the claim to Defendant UTC and Defendant Grogan. UTC and/or Grogan in turn assigned the claim to HiRise to conduct an engineering inspection of the Property to determine the nature and extent of the damages.

27.    HiRise assigned Andrew Braum, a highly regarded and well respected New York State licensed Professional Engineer, to conduct the engineering analysis and write a report. On or about December 5, 2012, Braum and his assistant Brett Sanicola inspected the Poretskys' damaged home.[3]

28.    During the inspection, Plaintiffs pointed out cracks in the foundation walls ask well as a sink hole in their front yard.[4] Braum noted that the exterior water mark was over two feet above ground level at the front of the house and the entire lower level was inundated.[5] Braum noted a fresh crack in the garage slab spanning the width of the garage.[6] Braum concluded "**This damage was 100% caused by the flood event**."[7] Braum noted flood water surrounded the property, rapidly moving surface water caused significant erosion and displacement of the soil.[8] Despite all these observations, the final report issued by HiRise and UTC inexplicably found that the cracks in the foundation walls were pre-existing.[9]

29.    On or about December 5, 2012, Brett Sanicola and/or Andrew Braum emailed Braum's original draft report to HiRise. The original report transmitted contained Andrew Braum's

---

[2] *See* Plaintiffs' Exhibit 1 – Allison's February 8, 2013 estimate.
[3] *See* Plaintiffs' Exhibit 2 – HiRise report issued to Plaintiffs dated December 24, 2012.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *See* Plaintiffs' Exhibit 2A, December 5, 2012 report sent by Brett Sanicola via email to HiRise.
[8] *See* Plaintiffs' Exhibit 2.
[9] *Id.*

"A.S.B. Enginerring, P.C." letterhead and conclusions that Plaintiffs' damage was caused by
Sandy flood. When HiRise received the original report from Braum that determined Plaintiffs'
house was extensively damaged by Hurricane Sandy, HiRise and Pappalardo "reviewed" and
likely doctored the report, and/or requested that Sanicola change conclusions and observations
to support a denial. December 10, 2012, Sanicola resubmitted via email an unsigned report on
HiRise letterhead with an added signature block for Matthew Pappalardo.[10] The resubmitted
report was dated December 5, 2012, a day before the claimed inspection, and contained
conclusions such as "**This damage was 100% caused by the flood event**."[11] Although the
resubmitted report was more in line with what HiRise needed, nonetheless, HiRise and
Pappalardo "reviewed" and altered the report.

30.     The report that Plaintiffs received was dated December 24, 2012, was allegedly signed
by Braum and Pappalardo, and contained alterations to the December 10th version sent by
Sanicola.[12] For example, the conclusion tying 100% of the damage to the flood was removed,
among other differences.[13]

31.     Mere months later, on or about June 2013, Braum terminated his business relationship
with Sanicola, HiRise, and Pappalardo. Sanicola was immediately hired by HiRise as a Project
Manager under Pappalardo. Sanicola continues to be employed by HiRise to date.

32.     On March 1, 2015, Andrew Braum was interviewed on the television program 60
Minutes and revealed that 96% of the engineering reports he drafted for HiRise and UTC after
Hurricane Sandy were doctored after submission to HiRise.

---

[10] Plaintiffs' Exhibit 2A.
[11] *Id.* at 1.
[12] Plaintiffs' Exhibit 2, December 24, 2012 report sent to Plaintiffs.
[13] *See* Plaintiffs' Exhibit 2; *see* Plaintiffs' Exhibit 2A.

33.     Plaintiffs have since learned that additional efforts were made to prevent the discovery of this widespread fraud, including an attempt to coerce dozens of engineers whose reports had been fraudulently altered to retroactively adopt the alterations by signing a "Memo of Understanding." This cover-up was triggered by a letter from an attorney confronting Hartford Insurance Company with details of HiRise's fraud. Immediately thereafter, Defendants UTC, HiRise, and Pappalardo began their efforts to conceal the fraud. The WYO carrier was directly implicated in emails by one of the individuals who altered the reports. According to the person directing this cover-up, Matthew Pappalardo, "We are closing the loop on all of the Sandy work and we need to get this form over to the insurance company as soon as possible."[14]

**From:** Matt Pappalardo
**Sent:** Monday, August 05, 2013 4:45 PM
**To:** Alex Stotis; Evangelos Skartsiaris; Chandra Claypool; Jenny Smaragdas
**Subject:** Final Approval of Sent UTC Reports

Good Afternoon Everyone!

Hope everyone is as bright and cheery as Jenny is every day!

Attached, please find a spreadsheet of all UTC firms and subs that we utilized during Sandy. As you all already know, we have to contact each of these subs (not by email) and provide them with final pdf versions of each and every one of the reports that they prepared for us and have them initial and sign the affidavit that we will provide. (Chandy, please provide the template that we presented to Weinberg today).

The list of subcontractors has been broken down into colored sections, with colors selected according to personalities:

Doom and Gloom (Angelo and Jenny, respectively)
Chandra
Matt

Each of you are allowed to delegate no more than two  of your subs to Alex Stotis to handle (6 total).

---

[14] *See* Plaintiffs' Exhibit 3.

A copy of this list has been uploaded to the UTC folder on the server. Once you have delegated your subs to Alex, please highlight his lines in electric blue, like his shirts.

A couple of notes regarding how to handle this situation:

- Provide your subs with each and every report that they prepared for us, either hardcopied or electronically depending on what they want
- Be open to going over the reports with them if that is what they require in order to get the form signed by next week. Meet with them at their office if necessary
- There is no reason to mention that there is an existing potential issue with one of our subs when talking with your assigned subs. Realize that this is something that we should have done anyway and treat it as such: "We are closing the loop on all of the Sandy work and we need to get this form over to the insurance company as soon as possible."
- Be friendly and confident with each of your subs while on the phone or at their office.
- Ask them what they are doing for work lately and use this as an opportunity to maybe create more work for the company or to market us
- Don't be gloomy
- Don't be doomy
- Be insistent in a nice, professional manner to get them to provide us with the signed form by the end of next week

Please note that this may seem like an intimidating and discouraging task now but I assure you that once you start to call these guys, you will see that they will be quick to cooperate. After all, they made a lot of money by working for us during the storm season. That and we're pretty awesome to deal with.

Any questions, see Jenny, since she has the answer for everything lately anyway.

Thanks!

Matt Pappalardo, M.S.

General Manager



50 Charles Lindbergh Blvd, Suite 503, Uniondale, NY 11553

O: 516.222.2257 | C: 917.680.5721 | F: 516.222.4572

E: mp@gebhr.com

W: www.gebhr.com

34.    In furtherance of the cover-up, 37 engineers were contacted by HiRise at the behest of carriers and Defendants. The engineering reports relied on by these property owners were not approved by the engineer whose name appeared on the report at the time the reports were used for the denial of the insurance claims. These unauthorized reports were used as a basis for determining the value of Plaintiffs' NFIP claim.

35. The following is the form that was instructed by Pappalardo to be provided to engineers that performed work for HiRise after Sandy:[15]



**HiRise Engineering P.C.**

LONG ISLAND, NY | BINGHAMTON, NY | DALLAS, TX | WASHINGTON D.C. | BOSTON, MA

**Memo of Understanding between HiRise Engineering, P.C. & Harold Weinberg, P.E.**

**From:** Harold Weinberg, P.E.

**Date:** 8/5/2013

**Regarding:** Assessment Reports

**Comments:**
I was retained by HiRise Engineering, P.C. to prepare Flood Assessment reports for the following properties. The reports were prepared by me and reviewed by the HiRise Quality Assurance Team. I have received a copy of the final draft of each report and agree with the conclusions of these reports.

| UTC | P.E. | Date | Property | Job # | Initial |
|---|---|---|---|---|---|
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 2837 West 23rd Street, Brooklyn NY 11224 | 8587 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 2442 East 70th Street, Brooklyn NY 11234 | 8653 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 2805 Ocean Parkway, Brooklyn NY 11235 | 8655 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 9 Keen Court, Brooklyn NY 11229 | 8669 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 3830 Cypress Avenue, Brooklyn NY 11224 | 8673 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/4/2013 | 2837 West 29th Street, Brooklyn NY 11224 | 8692 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/5/2013 | 2425 E. 70th Street, Brooklyn, NY 11234 | 8656 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/9/2013 | 56 Dover St, Brooklyn NY 11235 | 8737 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/9/2013 | 229 Exeter Street, Brooklyn, NY 11235 | 8895 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/9/2013 | 3086 Gerritsen Ave, Brooklyn NY 11229 | 8926 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/9/2013 | 150 Coleridge Street, Brooklyn NY 11235 | 8955 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/14/2013 | 2851 W. 35th St., Brooklyn, NY | 9303 | |
| United Technical Consultants, LLC | Harold Weinberg | 1/18/2013 | 2709 W 16th Street, Brooklyn, NY | 9525 | |
| United Technical Consultants, LLC | Harold Weinberg | 3/1/2013 | 164 Amherst St, Brooklyn, NY | 9877 | |
| United Technical Consultants, LLC | Harold Weinberg | 5/16/2013 | 2442 East 70th Street, Brooklyn NY 11234 | 8653.2 | |

x_____          x_____
Joseph Celentano, President          Harold Weinberg, P.E.
HiRise Engineering, P.C.              Harold Weinberg, P.E., P.C.

50 CHARLES LINDBERGH BLVD, SUITE 503, UNIONDALE, NY 11553 | O: 516.222.2257 | F: 516.222.4572 | WWW.GEBHR.COM | INFO@GEBHR.COM

36. Engineer Andrew Braum refused to go along with this cover-up. When confronted with the fraud perpetrated under his name and engineering seal, hired independent counsel and refused to further communicate with HiRise Engineering.

37. When Braum's bogus report was received by SIMSOL and Allison, they willfully ignored the fact that the report contradicted the facts observed first-hand by Allison and made known to SIMSOL. SIMSOL and Allison blindly accepted the fraudulent and outcome oriented

---

[15] *Id.*

HiRise report because SIMSOL and Allison knew this was the result desired by Standard Fire. To contradict Standard Fire would jeopardize continued and future business and revenue.

38.     The false conclusions used by Defendants to undermine Plaintiffs' claim for insurance benefits were not the result of sound engineering methodology. The conclusions were "reviewed" and likely altered by an individual who is not even an engineer! HiRise and Pappalardo had pre-determined conclusions and manipulated the facts of Plaintiffs' case to fit those conclusions.

39.     Magistrate Judge Gary Brown took numerous issues with a similar process which he dubbed "reprehensible" and "flawed."[16]   In a separate matter, Judge Brown's scathing order finds:

> [T]he evidence adduced in this matter demonstrates that U.S. Forensic, an engineering firm retained by defendant Wright National Flood Insurance Company to examine a storm-battered house in Long Beach, New York, unfairly thwarted reasoned consideration of [Ramey and Raisfeld's] claim through the issuance of a baseless report. The engineer sent by U.S. Forensic opined in a written report that the home at issue had been damaged beyond repair by Hurricane Sandy. A second engineer, who did little more than review the photographs taken by the inspecting engineer, secretly rewrote the report, reversing its conclusion to indicate that the house had not been damaged by the storm, and attributing—without sufficient evidence—defects in the home to long-term deterioration. This process, euphemistically dubbed a "peer review" by U.S. Forensic, was concealed by design from the homeowners, remained uncovered during the Court-assisted discovery process and came to light through near happenstance. In a misguided attempt to defend these flawed practices, [Wright National Flood Insurance Company] has elicited evidence that this "peer review" process may have affected hundreds of Hurricane Sandy flood insurance claims—and possibly more.[17]

40.     Similarly here, the Poretskys' report was "reviewed" by Pappalardo (not an engineer), who never inspected the Property and likely rewrote the report, revised its conclusion to indicate

---

[16] *See* Plaintiffs' Exhibit 4 - Judge Brown's November 7, 2014 memorandum and order at 2-3. This memorandum and order was issued in Cause No. 1:14-mc-00041-CLP-GRB-RER, *In re Hurricane Sandy Cases, see* DE [637] and Cause No. 2:14-cv-00461-JFB-SIL, *Raimey v. Wright Flood Insurance Company, see* DE [82].
[17] *Id.* at 2-3 (emphasis added).

that the house was not damaged by Sandy, to conclude – without sufficient evidence – that the damage to the foundation walls was pre-existing. It is also likely that HiRise and Pappalardo directed Sanicola to alter the original report and/or provided Sanicola with form document to use.

41.     Not surprisingly, similar alterations have recently been brought to light during discovery in separate cases brought by similarly situated victims to HiRise and Pappalardo's fraudulent tampering. In *Corrigan v. The Standard Fire Insurance Company*, HiRise produced reports exhibiting obvious and blatant changes from their natural state. Specifically, the metadata of the reports in question confirmed changes in the author's name, disappearance of emails, and the removal and/or disappearance of track changes previously demonstrated in certain reports. The *Corrigan* case is only one example where HiRise's document production raised more questions evidencing fraud than answers.

42.     Further, in the case of *Breidenbach v. HiRise et. al.* filed in the Supreme Court of the State of New York, Judge McCormack determined that the evidence Defendants annexed to their Motions to Dismiss supported Plaintiffs' claims of fraud, rather than Defendants' grounds for dismissal. In that case, Defendants annexed to their Motion to Dismiss what they claimed was the original report sent by Braum to HiRise. Judge McCormack noted:

> "**It is clear the reports are different. The 'Conclusions' sections of both reports contain similar language but the report not signed by Braum contains an extra sentence**…Both reports agree that pressure…caused some horizontal cracking, but this finding is worded differently….The 'Recommended Repairs' sections are identical except that the report signed by Braum….[contains an additional sentence] that is conspicuously absent in the report not signed by Braum.
>
> Assuming all facts as stated by Plaintiffs are true, and according Plaintiff every benefit of the doubt, the court finds Plaintiffs have met the

elements of fraud, for the purposes of surviving a motion to dismiss…[HiRise's] **removing the sentence that hydrostatic caused damage, there is both a misrepresentation and an omission that Defendants knew were false**. This report was then sent to Standard Fire, causing Plaintiffs to rely on its accuracy to ensure they got a proper award, and when they did not, they were injured. **Contrary to Defendants' arguments, the documentary evidence actually points in favor of the elements of fraud**."[18]

43.     Similar to Breidenbach, the report produced to Plaintiffs[19] in this case contains changes from the December 5, 2012 report[20] that at the very least misrepresent and omit facts that Braum determined necessary to include. The altered report was sent to Standard Fire and then Plaintiffs as an artifice to deny their proper claim for covered damages.

44.     Accordingly, upon information and belief, the unlawful scheme perpetrated by Defendants is not an isolated event but an ongoing criminal organization.  Ultimately, the fraudulent reports, fraudulent payments, and fraudulent reasons for denying Plaintiffs' claim were provided to Plaintiffs through mail or wire transfer.

### *Liability of HiRise and Pappalardo*

45.     In conspiracy with the other Defendants, HiRise and Pappalardo fraudulently altered engineering reports submitted by Braum. It is clear that HiRise habitually changed reports and used copied signatures, then tried to cover it up with a "memorandum of understanding." Recently, the New York Attorney General's office confirmed a raid on HiRise's Long Island offices as a result of its ongoing criminal investigation into HiRise's alteration of the reports. *See*   http://newyork.cbslocal.com/2015/02/18/li-engineering-firm-raided-amid-attorney-general-

---

[18] See Plaintiffs' Exhibit 5- Honorable James P. McCormack's Order dated May 5, 2015 in *Michael Breidenbach and Susan Breidenbach v. HiRise Engineering, P.C., Matthew Pappalardo, et. al.*.
[19] Plaintiffs' Exhibit 2.
[20] Plaintiffs' Exhibit 2A.

probe-into-sandy-insurance-payouts/.    In this case, the false report issued by HiRise was ultimately used by Standard Fire to deny the Poretskys' claim.

46.    Defendants HiRise and Pappalardo altered the reports with the specific intent to defraud Plaintiffs of their legal benefits under the contract with Standard Fire.  HiRise and Pappalardo used the U.S. mail, interstate telephone, and/or interstate email to perpetrate the fraud.

### *Liability of Standard Fire, NFS, SIMSOL, and Allison*

47.    Standard Fire, NFS, SIMSOL, and Allison knew or were willfully blind to the fact that HiRise and Pappalardo were fraudulently altering engineering reports to deny legitimate claims. In many instances, including Plaintiffs' claim, the engineering report directly contradicted facts observed by adjusters like Allison.

48.    Defendant Standard Fire and/or NFS retained Defendants SIMSOL and Allison to perform adjusting services.  Upon inspection of the Property, Allison observed the extensive damage to the home first-hand. The engineering conclusions touted by HiRise, Pappalardo, UTC, and Grogan directly contradicted facts observed by Allison and made known to SIMSOL and NFS.

49.    Standard Fire, NFS, SIMSOL, and Allison directed and/or participated in the fraud on Plaintiffs, and Standard Fire, NFS, SIMSOL, and Allison directed and/or participated in the commission of the mail and/or wire fraud.  Despite the fact that Standard Fire, NFS, SIMSOL, and Allison knew or should have known of the alteration of the engineering report, Standard Fire used the falsified report as an excuse to deny Plaintiffs' claim for benefits.

50.    Standard Fire's, SIMSOL's, NFS's, and Allison's failure to investigate the facially inaccurate engineering report after having the above knowledge constitutes "willful blindness"

17

to the illegal and fraudulent actions of HiRise and Pappalardo; therefore, Standard Fire, NFS, SIMSOL, and Allison are liable under the doctrine of conscious avoidance.

51.     The doctrine of conscious avoidance stands for the principle that a person who deliberately shuts his eyes to an obvious means of knowledge has sufficient *mens rea* for the "knowing" element of a criminal offense.[21] Even in a conspiracy case in which specific intent must be proven, such as mail fraud cases, conscious avoidance is sufficient to establish mens rea.[22]

52.     Standard Fire stands to benefit from this fraudulent scheme both directly and indirectly. Based on information and belief, due to the way in which the WYO program is funded by FEMA, Standard Fire actually reaps greater profit by driving up claims handling expenses and denying legitimate claims. Further, Standard Fire avoids the threat of a government audit by reducing the amount paid on claims, even if legitimate. Standard Fire is highly motivated to avoid an audit. In 2009, the GAO audited other WYO carriers and determined that they had significantly overbilled FEMA for administering the WYO program.  Standard Fire is motivated by the desire to keep their ill-gotten gains by driving up claims handling expenses while reducing the amount paid on claims. Standard Fire acted in concert with HiRise, Pappalardo, UTC, Grogan, SIMSOL, and Allison to achieve this unlawful purpose.

53.     NFS, SIMSOL and Allison also stand to benefit from this fraudulent scheme. The more SIMSOL and Allison contribute to Standard Fire's inflated expenses, the easier it is for NFS, SIMSOL and Allison to ensure future assignments and expense payments from Standard Fire.

---

[21] *United States v. Quinones*, 635 F.3d 590, 601 (2d Cir. 2011).
[22] *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989).

18

### *Liability of UTC and Grogan*

54.     UTC and Grogan had knowledge of this conduct and participated in the fraud perpetrated on Plaintiffs.  Research on Defendant Grogan reveals he has a history of engaging in criminal activity.[23]  In situations where UTC and Grogan may not have had specific knowledge of altered reports, they were aware of this ongoing scheme and are liable under the doctrine of conscious avoidance.

55.     Once HiRise and Pappalardo sufficiently altered reports, like Plaintiffs', they would send the reports to UTC for approval. UTC would then approve or decline the report version, and provide direction to HiRise and/or Pappalardo related to the claim. UTC and Grogan's direct involvement in the scheme has become increasingly more evident through discovery in other cases filed in this Court.

56.     UTC and Grogan stand to benefit from this fraudulent scheme. The more UTC and Grogan contribute to Standard Fire' inflated expenses, the easier it is for UTC and Grogan to ensure future assignments and expense payments from Standard Fire.

## RICO ALLEGATIONS

**The HiRise Enterprise**

57.     HiRise is a "person" within the meaning of 18 U.S.C. §1961(3).

58.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals and entities associated in fact that Plaintiffs refer to as the HiRise Enterprise: (1)

---

[23] A LexisNexis report on Mr. Grogan shows that he pled guilty to theft by failing to make required disposition of funds received and violations of Pennsylvania Securities Act – Sales and Purchases. There are several other criminal charges listed against Mr. Grogan with unknown dispositions. Mr. Grogan was an attorney in Pennsylvania, but was disbarred for misconduct.

HiRise; (2) Pappalardo; (3) UTC; (4) Grogan; (5) SIMSOL; (6) Allison; (7) NFS; and (8) Standard Fire.

59.     The HiRise Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce. The members of the HiRise Enterprise function as a continuing unit as described below and share the common purpose of creating illegitimate engineering reports to be used to fraudulently deny, in whole or in part, insurance claims for their individual and collective economic gain.

60.     While HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire participate in and are members and parts of the HiRise Enterprise, they also have an existence separate and distinct from the enterprise.  The common goal was to reduce payments on legitimate insurance claims, drive up costs of claims handling and investigation of these claims. This generated profits for the enterprise as a whole and for participating individuals. Defendant Standard Fire also benefitted by avoiding a government audit through inflating costs and reducing claims paid.

61.     In order to successfully defraud Plaintiffs in the manner set forth above, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire needed a system that would allow them to deny insurance claims, in whole or in part, and thereby avoid an audit by FEMA. Standard Fire stood to benefit directly from increasing claims handling expenses due to the manner in which FEMA reimburses WYO carriers for their participation in the NFIP.  Due to incentives in the reimbursement program, WYO carriers can actually profit by incurring additional expenses.  HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire could spur and prolong litigation so that they could charge and collect unnecessary expense

and litigation support service fees and expenses. Standard Fire participated in the scheme so it could justify denying or underpaying claims; therefore it could avoid an audit by FEMA and having to reimburse FEMA for overpayments.

62.     HiRise controls and operates the HiRise Enterprise as follows:

   (a)    By falsifying and altering engineering reports in order that the HiRise Enterprise can deny or underpay valid insurance claims;

   (b)    By falsifying and altering engineering reports to be utilized to deny or underpay valid insurance claims HiRise, Pappalardo, UTC, Grogan, SIMSOL, and Allison can charge unnecessary and/or inflated litigation costs;

   (c)    By falsifying and altering engineering reports to be utilized to deny or underpay valid insurance claims, Standard Fire can avoid being audited by FEMA and can avoid reimbursing FEMA for an overpayment of a claim; and

   (d)    By falsifying and altering engineering reports to increase claims handling costs, the HiRise Enterprise passes on the expenses to FEMA to justify additional payments to Standard Fire.

63.     As set forth above, the HiRise Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire engage.

**Predicate Acts**

64.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud). As set forth below, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire have and continue to engage in conduct violating each of these laws to effectuate their scheme.

65.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations, or promises,

HiRise, Pappalardo, UTC, Grogan, Standard Fire, SIMSOL, NFS, and Allison, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, payments, and false reports.

66.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire also in violation of 18 U.S.C. §1343, transmitted and received by wire matter and things which include but are not limited to contracts, invoices, correspondence, payments, and altered reports.

67.    The matter and things sent by HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia,* altered reports containing false and fraudulent misrepresentations that were utilized by Standard Fire to improperly deny coverage to or underpay Plaintiffs' claim. The falsified report was the mailed and/or emailed from HiRise and Pappalardo in New York to UTC and Grogan in Pennsylvania to Allison in California, to SIMSOL in Florida, and NFS and/or Standard Fire in Montana, where Standard Fire used to as the basis to deny Plaintiff's claim. The altered and/or improperly "peer reviewed" U.S. Forensic report and denial letter were mailed from Standard Fire and/or NFS in Montana to Plaintiffs in New York.

68.    Other communications sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison,

NFS, and Standard Fire included information or communications in furtherance of or necessary to effectuate the scheme.

69.    HiRise's, Pappalardo's, UTC's, Grogan's, Standard Fire's, SIMSOL's, NFS's, and Allison's misrepresentations, acts of concealment, and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and for the purpose of denying Plaintiffs' claim. This was done for the purpose of reducing paid claims to avoid an audit which would lead to the detection of improper payments and increased cost of claims handling to the direct financial benefit of Defendants.

70.    HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material and would be relied upon by Plaintiffs. Plaintiffs were defrauded as a result of the misrepresentations and omissions as set forth above. The fraud involved tens of thousands of dollars in legitimate insurance claims that were denied.

71.    As a result, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire have fraudulently obtained engineering and litigation support fees and expenses.  These Defendants were able to charge for unwarranted engineering services and other fees based upon their participation in fraudulently denying legitimate insurance claims.

72.    Standard Fire intentionally denied or underpaid insurance claims.  By diminishing the amounts paid on claims, Standard Fire avoided a government audit on payment amounts and on the actual cost of administering the WYO program. Additionally, due to the reverse incentives, Standard Fire stood to benefit directly from increasing claims handling costs upon which their payments from FEMA were based.

73.    Plaintiffs have been injured in their business or property by Defendants' overt acts of mail and wire fraud. Plaintiffs' legitimate claim for payment to fully repair their home was denied by Standard Fire based on fraudulent engineering reports which directly reduced the amount paid to approximately $55,000.

### Pattern of Racketeering Activity

74.    HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years.  In fact, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire have committed multiple acts of racketeering activity.  Plaintiffs' claim and the claims of hundreds of other Standard Fire insureds were fraudulently denied in whole or in part on different dates, proving separate and definable predicate acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs. Each of these denials and payments is a separate predicate act making up a pattern of racketeering activity occurring within the last 10 years.

75.    The  multiple acts of racketeering activity which Defendants committed and/or conspired to commit, or aided and abetted acts, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## Causes of Action Against All Defendants

### FIRST CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962(c)

76.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

77.     This claim for relief arises under 18 U.S.C. §1962(c).

78.     As set forth above, HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire have violated 18 U.S.C. §1962(c) by conducting or participating, directly or indirectly, in the conduct of the affairs of the HiRise Enterprise through a pattern of racketeering. Defendants have repeatedly commit acts of fraud, and other violations of federal and New York state law that they should be held accountable for.

79.     As a direct and proximate result, Plaintiffs have been injured in their business or property by the predicate acts which make up the defendants' patterns of racketeering activity through the HiRise Enterprise.

80.     Specifically, Plaintiffs have been injured in their business or property by having their legitimate insurance claims denied in whole or in part as a result of the scheme.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

81.     Plaintiffs hereby incorporate by reference as if fully set forth herein all of the preceding paragraphs.

82.    Plaintiffs and Defendant Standard Fire entered into a contract when Plaintiffs purchased, and Standard Fire issued, the Policy insuring the Property.

83.    The Policy provided flood insurance coverage to Plaintiffs for physical damage to Plaintiffs' Property caused by flood.

84.    Plaintiffs fully performed under the contract by paying all premiums and cooperating with Defendant Standard Fire regarding the claim.  Plaintiffs complied with all conditions precedent to their recovery herein, including appropriate and adequate demands, or Standard Fire waived or excused such conditions precedent.

85.    Defendant Standard Fire failed to perform and materially breached the insurance contract when it wrongly failed to pay and refused to reimburse Plaintiffs the monies they are owed for damages to the Plaintiffs' Property covered under the Policy.

86.    After revelations of widespread fraud in the claims handling processes following Hurricane Sandy, FEMA waived its proof of loss requirement by reopening all Hurricane Sandy claims, including Plaintiffs'. Beginning on or about May 18, 2015, FEMA sent letters to all 144,000 Sandy claimants, including Plaintiffs, informing them of the claims reopen process and giving them the opportunity to submit additional evidence in proof of loss for their claim. FEMA is allowing claimants the opportunity to request an additional inspection by an adjuster or an engineer, if required.  The NFIP's reopening of all Hurricane Sandy cases has at least extended the time for Plaintiffs to present evidence of flood damage ignored or wrongfully denied by Standard Fire (and other WYO carriers) and claim additional Policy proceeds to which they are entitled. Accordingly, the deadline for Plaintiffs to seek redress from the Court for Defendants' wrongful conduct has also been restarted, or at least extended.

87.    As a result of Standard Fire's breach of contract, Plaintiffs suffered damages.

88.    A duty of good faith and fair dealing is implicit in every New York contract and a breach of that duty is a breach of the contract. *Fleisher v. Phoenix Life Ins.* Co., 858 F. Supp. 2d 290, 298 (S.D.N.Y. 2012); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012).

## THIRD CAUSE OF ACTION FRAUD

89.    Plaintiffs hereby incorporate by reference as if fully set forth herein all of the preceding paragraphs.

90.    Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, NFS, and Standard Fire are liable to Plaintiffs for fraud. In addition to the violations of 18 U.S.C. §1962(c) discussed at length above, Defendants are liable for fraud under New York State law actionable pursuant to 28 U.S.C. §1367. Each and every one of the representations, as described above and incorporated herewith, concerned material facts at issue with Plaintiffs' home and the subsequent denial of their claim for covered damages.

91.    New York Courts have held that to establish fraud, plaintiffs must prove that (1) the defendant made a representation as to a material fact; (2) such representation was false; (3) defendant(s) intended to deceive plaintiffs; (4) plaintiffs believed and justifiably relied upon the statement and; (5) plaintiffs suffered damages as a result. *Ross v. Louise Wise Servs. Inc.*, 8 N.Y.3d 478, 488 (N.Y. 2007); *New York Univ. v. Cont'l Ins. Co*., 87 N.Y.2d 308 (N.Y. 1995); CPLR §3016(b).

27

92.    Here, Defendants HiRise and/or UTC and/or Grogan and/or Pappalardo altered Braum's initial engineering analysis report to contain conclusions that were both false and not based on sound engineering principles. The two versions of the engineering report attached hereto show that HiRise and/or Pappalardo made alterations to Braum's engineering report. The final engineering report sent to Plaintiffs concluded that the damages to Plaintiffs' property were pre-existing and not caused by the Sandy flood water. However, during his inspection, Braum found significant evidence that indicated that the structural and/or foundation damages were in fact caused by the Sandy floodwaters. Braum's report mentions that the entire first level of the home was inundated with flood water, he noted a fresh crack in the foundation slab, and that rapidly moving flood waters surrounded the property.

93.    Braum and/or Sanicola followed the directives of Defendants HiRise, Pappalardo, UTC, and/or Grogan, and submitted Braum's report to them for review. Defendants HiRise, Pappalardo, UTC, and/or Grogan then changed the original valid conclusions within the report to language that Standard Fire could reasonably use to deny Plaintiffs' claim. The final report was never sent back to Braum to sign and seal because the conclusions contradicted those that he reached. Rather, Defendant Pappalardo signed the report and he and/or HiRise and/or UTC and/or Grogan and/or SIMSOL and/or Allison and/or NFS sent the misrepresentations onto Plaintiffs and Standard Fire.

94.    The final engineering report contains misrepresentations and omissions that Defendants HiRise, Pappalardo, UTC and Grogan knew were false at the time made. The final report was sent to Defendants Standard Fire, Allison, SIMSOL, and NFS, who also had reason to know, or should have known, that the report contained incorrect altered conclusions and/or omissions.

95.    When the final altered report was signed by Pappalardo and sent to Defendants, all Defendants knew that Plaintiffs would rely upon its accuracy to ensure they got a propwer award. When the report was then sent to Plaintiffs, all Defendants represented that the conclusions contained therein were accurate and based on a reasonable degree of engineering certainty, when in fact they were neither accurate, nor based on any sound engineering principle. This report was falsified with the intent that Plaintiffs and Standard Fire rely upon it.

96.    Defendants HiRise, UTC, Grogan, and Pappalardo intentionally falsified Plaintiffs' report to continue getting paid by Standard Fire, and to procure assignments to handle future claims. Likewise, NFS, SIMSOL and/or Allison blindly accepted the intentionally falsified reports to procure assignments to handle future claims. Defendant Standard Fire knew or was willfully blind to the intentionally falsified reports as an excuse to deny Plaintiffs and to further serve its own fiscal interests over, and in lieu of, its duty to Plaintiffs.

97.    The misrepresentations made by Defendants resulted in the denial, in whole or in part, of Plaintiffs' valid claim for Sandy damages. Plaintiffs have been unable to make the structural and/or other repairs needed as a result, and the value and structure of their Property continue to diminish.

98.    Unfortunately, Defendant HiRise's, Pappalardo's fraudulent conduct is not solely limited to Plaintiffs' case. Defendants habitually changed reports and used copied signatures, then tried to cover it up with a "memorandum of understanding."   Recently, the New York Attorney General's office confirmed a raid on HiRise's Long Island offices as a result of its ongoing criminal     investigation     into     HiRise's     alteration     of     the     reports.     *See*

http://newyork.cbslocal.com/2015/02/18/li-engineering-firm-raided-amid-attorney-general-probe-into-sandy-insurance-payouts/.

99.     Defendants HiRise, UTC, Grogan, and Pappalardo altered the reports and Defendants SIMSOL, Allison, NFS, and Standard Fire approved such alterations with the specific intent to defraud Plaintiffs of their legal benefits under the contract with Standard Fire and as such should be held liable.  *See Ross v. Louise Wise Servs. Inc.*, 8 N.Y.3d 478, 488 (N.Y. 2007); *New York Univ. v. Cont'l Ins. Co*., 87 N.Y.2d 308 (N.Y. 1995).

**FOURTH CAUSE OF ACTION AGAINST
DEFENDANTS FOR ACTS OUTSIDE THE SCOPE OF THE
ARRANGEMENT UNDER THE NFIP**

100.    The claims asserted herein against Defendants are largely based on actions exceeding Defendants' authority to act on the government's behalf. 44 C.F.R. pt. 62, app. A, art. III(D)(2)-(3)(a). Pappalardo "reviewed" and likely doctored a number of reports in conjunction with Defendants HiRise, UTC, Grogan, Allison, NFS, Simsol, and Standard Fire, and on behalf of Standard Fire.  Further, after the litigation at bar arose, Defendants acted outside the scope of their NFIP Arrangement when they failed to abide by FEMA's reporting standards. 44 C.F.R. pt. 62, app. A, art. III(D)(2).

101.    Despite being informed of the allegations against them, Defendants, as WYO carriers who are parties to litigation arising from their claims handling under the NFIP, failed to submit loss payments and related expenses that meet the documentation requirements of the Financial Control Plan under the NFIP arrangement. 44 C.F.R. pt. 62, app. A, art. III(D)(2).  Specifically, despite allegations against Defendants of fraud, tortious interference, and other improper acts that were outside of the agreement between NFIP and Defendants, Defendants failed to notify

30

FEMA's Office of the Chief Counsel ("OCC") of the litigation at bar. Defendants' inaction prevented FEMA from making a just determination of whether Defendants' tortious conduct fell within the purview of the NFIP Arrangement.

102.    Defendants failure to meet FEMA's reporting requirements is further evidence of Defendants' attempt to injure Plaintiffs, and subsequently "take cover" from FEMA's sovereign immunity protection. Thus, Defendants' tortious actions, fraudulent alterations, conspiratorial conduct, and inaction with FEMA are further evidence of Defendants' attempt to improperly handle Plaintiffs' claims.

**Causes of Action Solely Against Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison and NFS**

**FIFTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH A CONTRACTUAL RIGHT**

103.    Plaintiffs hereby incorporate by reference as if fully set forth herein all of the preceding paragraphs.

104.    Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison and/or NFS, have individually and collectively caused tortious interference with Plaintiffs' flood insurance contract with Standard Fire in violation of New York law, which is actionable pursuant to 28 U.S.C. §1367.

105.    New York Courts have determined that to recover under a cause of action for tortious interference with a contract, plaintiffs must show the existence of a valid contract between plaintiffs and a third party, the defendants' knowledge of that contract, the defendants intentional procurement of the third party's breach of the contract, actual breach of the contract,

and damages resulting from the breach. *Pabon v. Many*, 99 A.D.3d 773, 774 (2d Dep't 2012); *see Lama Holding Co. v Smith Barney*, 88 NY2d 413, 424 (1996).

106.    It is uncontested that Plaintiffs had a valid contract for flood insurance with Standard Fire. Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, and NFS had actual knowledge of the existence of the contract between Plaintiffs and Standard Fire as Defendants were assigned to conduct an evaluation and/or engineering analysis of Plaintiffs' property for the use of fulfilling the obligations of Standard Fire to Plaintiffs. Defendants altered or conceded to the alterations of Braum's reports with the intent that Plaintiffs and Standard Fire rely on the conclusions as a legitimate ground to deny Plaintiffs' claim. Standard Fire did deny Plaintiffs claim on the basis of Defendants' report, thereby causing Standard Fire to breach the contract, and resulting in underpayment to Plaintiffs on their proper claim. Simply stated, but for the altered engineering analysis, Standard Fire would not have denied Plaintiffs' claim for structural and/or foundation damage; and that the reports formed the basis of the denial and resulting underpayment i.e. breach of Plaintiffs' contract.

107.    Therefore, Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, and NFS are liable for tortious interference with Plaintiffs' contractual rights.

108.    Further, Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, and/or NFS conspired to tortiously interfere with Plaintiffs' contract with Standard Fire. A plaintiff may plead the existence of a conspiracy "[in order] to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme." *Abacus Federal Savings Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010); *see Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969 (N.Y. 1986).

109.    Defendants HiRise, Pappalardo, UTC, Grogan, SIMSOL, Allison, and NFS were members of a combination of two or more person whose object and/or intention was to accomplish an unlawful or lawful purpose or plan by unlawful means. In reaching a meeting of the minds as to the tortious interference with Plaintiffs' contractual rights, Defendants intentionally acted in furtherance of their plan or purpose. Plaintiffs suffered injuries as a result.

**Causes of Action Against Defendants HiRise, Pappalardo, UTC, and Grogan**

**SIXTH CAUSE OF ACTION**
**PROFESSIONAL MALPRACTICE**

110.    Plaintiffs hereby incorporate by reference as if fully set forth herein all of the preceding paragraphs.

111.    Defendants HiRise, Pappalardo, UTC, and Grogan, have individually and collectively committed professional malpractice in violation of New York law, which is actionable through 28 U.S.C. §1367.

112.    Defendant HiRise's, Pappalardo's, UTC's and Grogan's conduct constitutes professional malpractice. Malpractice is essentially the negligence of a professional toward the person for whom his services are rendered. *Cubito v. Kreisberg*, 69 AD2d. 738, 742 (1979). Traditionally, this cause of action is only available against "learned professions," such as engineers. *Santiago v. 1370 Broadway Assocs.*, L.P., 1999 N.Y. App. Div. LEXIS 9101 (N.Y. App. Div. 1st Dep't 1999); *Tambrands, Inc. v. Lockwood Greene Engrs.*, 178 AD2. 406 (N.Y. App. Div. 2d Dep't 1991).

113.    Defendants HiRise and UTC, as engineering firms would be accountable for professional malpractice. Defendant Grogan would be liable for allowing Defendant Pappalardo to act as an engineer.

33

114.    Professional negligence requires proof that there was a departure from the accepted standards of practice, and that departure was the proximate cause of the injury. *Mamdouh v. Leger*, 943 N.Y.S.2d 792 (N.Y. Sup. Ct. 2011). New York Courts have held that contractual privity is not required between the injured party and the party(ies) who caused the injury in order to maintain an actionable offense. *Ossining Union Free School Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417 (1989); *Credit Alliance Corp. v. Anderson & Co.,* 65 N.Y.2d 536 (1985).

115.    Here, Defendants HiRise, UTC and Grogan employed a non-licensed engineer, Defendant Pappalardo, as the Department Manager in charge of Plaintiffs' claim. Defendant Pappalardo, under the directive and control of Defendants HiRise, UTC and Grogan acted as an engineer without the proper legal licensing authority to do so. Defendant Pappalardo was not skilled with the requisite experience, education or licensing to make decisions as though he was an engineer. As such, all actions taken on his behalf regarding Plaintiffs' claim amount to professional malpractice and/or professional negligence by HiRise, UTC and Grogan. An unlicensed untrained person making erroneous binding decisions as though he was an engineer is a departure from the accepted standards of the practice of engineering. 943 N.Y.S.2d 792.

116.    Defendant Pappalardo was directed by Defendants HiRise, UTC and Grogan to review conclusions in valid draft engineering reports, alter them if necessary, and then sign his name upon completion. Defendants HiRise, UTC and Grogan either knew or should have known that Pappalardo was altering these reports. And if Defendants HiRise, UTC and Grogan claim to have not known that Pappalardo was altering the reports, they were not properly supervising him.

117.    Defendants Pappalardo, HiRise, UTC and Grogan sent the reviewed, altered reports to Plaintiffs and to Standard Fire, knowing that both would rely upon them. Standard Fire relied on

34

the altered engineering report insomuch as they denied Plaintiffs' claim for damages based on this report. Plaintiffs relied on the accuracy of the engineering report to ensure they got a proper award for their covered flood damage. Plaintiffs' were not properly compensated as a result, and Plaintiffs have continued to endure the hardships that resulted from the structural/foundation damage caused by Sandy floodwaters to their home.

118.     Defendants HiRise's, UTC's and Grogan's use of an unlicensed, untrained professional to review engineering conclusions, alter engineering reports, and sign these reports with the implication that the foregoing was handled by a licensed engineer is a departure from the accepted engineering standards. *Tambrands, Inc. v. Lockwood Greene Engrs.* 178 AD2. 406. Defendants actions caused Plaintiffs' claim to be denied, and thereby Plaintiffs to not be paid for their covered damages. Defendants actions amount to professional malpractice and/or professional negligence. *Cubito v. Kreisberg*, 69 AD2d. 738, 742 (1979); *Mamdouh v. Leger*, 943 N.Y.S.2d 792 (N.Y. Sup. Ct. 2011).

## DAMAGES

119.     Plaintiffs were denied their legitimate claim for policy benefits which resulted in a loss exceeding $150,000.   The denial of Plaintiffs' claim thwarted Plaintiffs' ability to properly restore their Property. Under 18 U.S.C. §§ 1964(c), Plaintiffs are entitled to treble damages, costs, attorney's fees, and prejudgment interest.

## JURY DEMAND

120.     For the issues properly presented to a jury, Plaintiffs have requested a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as

follows

    A.  Declaring that Defendants have violated Section 1962(c) of RICO;

    B.  Ordering Defendants to pay treble the amount of damages suffered by Plaintiff as a result of Defendants' violations of Section 1962(c) of RICO;

    C.  Declaring Defendant The Standard Fire Insurance Company liable for breach of contract;

    D.  Declaring that Plaintiff is entitled to coverage under the Policy for Plaintiff's damages to the insured property caused by flood;

    E.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

    F.  Awarding to Plaintiff compensatory and consequential damages against Defendant, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law;  and

    G.  Granting such other relief as this Court deems to be just and proper.

    H.  Declaring that Defendants unlawful acts are significantly outside the scope of Defendants' Agreement with NFIP.

DATED: July 29, 2016

Respectfully submitted,

**MOSTYN LAW FIRM**

*/s/ J. Steve Mostyn*
J. Steve Mostyn
JM9387
Texas State Bar No. 00798389
3810 West Alabama Street
Houston, Texas 77027
(713) 861-6616 (Office)
(713) 861-8084 (Facsimile)
jsmdocketefile@mostynlaw.com
***Pending Admission Pro Hac Vice***

**DENIS G. KELLY & ASSOCIATES, P.C.**

*/s/ Denis G. Kelly*
Denis G. Kelly
DK7734
New York State Bar No. 2520906
74 West Park Avenue
Long Beach, NY 11561
(516) 897-0800 (Office)
(516) 897-0812 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

37